IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 SEP 29 PM 3:05

U.S.
N.D.

BILLY KENNEDY,                          }
                                        }
        Plaintiff,                      }
                                        }
v.                                      }        CASE NO. CV 01-B-2364-NE
                                        }
ROADWAY EXPRESS, INC.,                  }
                                        }
        Defendant.                      }

ENTERED
SEP 2 9 2004

**MEMORANDUM OPINION**

Currently before the court is a Motion for Summary Judgment, or in the

alternative, for Partial Summary Judgment filed by defendant Roadway Express, Inc.

("Roadway").[1]  (Doc. 61.)   In his Complaint and Amended Complaints (docs. 1, 13, 22),

plaintiff Billy Kennedy alleges racially disparate treatment, a racially hostile work

environment, and retaliation under 42 U.S.C. § 1981, et. seq. and Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000, et seq.[2]  Upon consideration of the

---

[1]Stanley Shanks was originally a defendant in this suit, but he is no longer a party to this suit.  Plaintiff's claims against Shanks were dismissed with prejudice.  (Doc. 50.)

[2]The court does not find any clearly articulated claims of disparate treatment other than those related to job assignments, equipment access, and discipline.  (Pl.'s Opp'n Br. at 2.) Plaintiff alleged several other claims which he did not address in his responsive submission. Roadway moved for summary judgment as to all of plaintiff's claims. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)("[p]resenting . . . arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court"). Therefore, the court deems plaintiff's unaddressed disparate treatment claims abandoned, and will not address them beyond this point.  The court also deems plaintiff's retaliation claim abandoned for the same reason.

90

record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

## I.    Factual Summary[3]

Plaintiff Billy Kennedy is an African-American male. (Doc. 22.) He began working for Roadway as a "casual," or part-time employee in 1994. (Doc. 64, Ex. 1 at 39.) Plaintiff became a full-time employee on May 22, 1995, which was his official hire date for purposes of seniority. (*Id.* at 50-51; Ex. 8.)

Roadway is a trucking company that ships freight throughout the United States. (Doc. 62 ¶ 3.) Roadway operates a facility in Madison, Alabama, known as the Huntsville terminal. (*Id.*) Stanley Shanks has been employed with Roadway since 1981, and has been the Huntsville terminal manager since 1996. (*Id.* ¶ 4.) Shanks is responsible for supervising dock supervisors and dispatchers at the Huntsville terminal. (*Id.* ¶ 5.) Billy Kennedy's job is Driver/Dock Worker. (*Id.* ¶ 7.) His job is to drive trucks and load and unload freight at the customer's place of business. (*Id.*)

The Huntsville terminal has several regular customers, and therefore several truck routes that are handled on a regular basis. (Doc. 62 ¶ 6.) Some of these runs are known and planned in advance, but others are sporadic because orders are placed by customers during the day without prior notice. (*Id.*) Roadway's freight includes "skid freight,"

---

[3]For purposes of summary judgment, all facts and reasonable inferences therefrom are drawn in favor of the plaintiff.

which is loaded and secured on pallets and moved with a forklift, and "hand freight," which is loose boxes and items loaded and unloaded from a truck by hand. (*Id.* ¶ 8.) Whether a load is "skid" or "hand" freight depends on the way the items are shipped by customers or prepared for pickup by customers. (*Id.*)

Roadway and the Teamsters have a Collective Bargaining Agreement ("CBA") that controls many aspects of Roadway's relationship with its drivers, including wages, hours, and terms and conditions of employment. (*Id.* ¶ 9.) Full-time pick-up drivers, including plaintiff, are unionized and covered by the CBA. (*Id.* ¶ 9 and Ex. 2.) The CBA requires Roadway to create a "seniority" list for all employees, based on hire dates. (Doc. 62 ¶ 11.) As of July 1, 2002, plaintiff was ninth in seniority on a list of fourteen employees. (Doc. 64, Ex. 8.)

Under the CBA, truck drivers "bid" on work based on their level of seniority. (Doc. 62, Ex. 2, Article 42 at 170-75.) Roadway placed work for bidding based upon start times. (Doc. 62 ¶ 10.) Based on business needs, certain start times are associated with certain runs for specific geographical areas. (*Id.*) Under the CBA, Roadway reserves the right to assign different areas, or customers, within given start times. (*Id.*)

## A.    Disparate Treatment Claims

### 1. Job Assignments

Plaintiff believes Roadway manipulates the bids to assign more labor intensive runs, the routes with the most "hand freight," to African-American employees. (Doc. 64, Ex. 1 at 221-23; Ex. 2 ¶ 18.) (Plaintiff cites examples of the other black drivers with the

same situation– switching of start times to more labor intensive runs– after they took a

particular start time, but I have not included it.)  He complained to union headquarters in

July 1998 about discrimination with the start times put up for bid.  (Doc. 64, Ex. 1 at 135;

Ex. 2 ¶ 11.)  The union sent Michael Kendrick to investigate; he spoke with Shanks and

Shanks reposted the bids.  (Doc. 64, Ex. 1 at 135; Ex. 2 ¶ 11.)  After the union

representative left, Shanks wrote plaintiff up for not wearing a seatbelt on the forklift and

for not setting the brake on the forklift.  (Doc. 64, Ex. 1 at 135-36; Ex. 2 ¶¶ 10-11.)

### 2. Access to Equipment

Plaintiff alleges he and other African-American employees are denied the use of

newer equipment at Roadway.  (Doc. 64, Ex. 1 at 231-35.)  Specifically, plaintiff states

that when his tractor broke down in August or September of 2000, he was given Jeff

Smith's tractor to drive, while Smith drove a nicer road tractor that was available.  (*Id.* at

231-234.)  Plaintiff also states he was forced to drive a truck with defective wheel seals in

May or June 2000, but after the appropriate form was filled out requesting maintenance,

he was not required to drive the truck.  (*Id.* at 245-47.)

### 3. Discipline

Plaintiff believes he and other African-American employees received harsher

discipline than white employees for the same or similar infractions.  On August 13, 1996,

plaintiff was issued a warning letter by Shanks for failing to protect his work time.  (Doc.

64, Ex. 1 at 70-71; Ex. 2 ¶ 6; Doc. 62, Ex. 9.)  Plaintiff believes Shanks did not follow the

appropriate procedure in the CBA regarding layoffs and recalls, because at the time,

plaintiff had been laid off for about six months. (Doc. 64, Ex. 2 ¶ 6.) Shanks later

followed the CBA guidelines and plaintiff followed procedure and reported to work.

(Doc. 64, Ex. 1 at 74-75.)

Plaintiff was issued a warning letter by Rozea for improper checking of freight on

July 13, 1998. (Doc. 62, Ex. 12; Doc. 64, Ex. 1 at 101-02.) He was issued another

warning letter for improper checking of freight on December 2, 1998. (Doc. 62, Ex. 13.)

Plaintiff testified that white drivers committed the same infractions without receiving

warning letters. (Doc. 64, Ex. 1 at 102, 107-08, 196-97.) The drivers include L.C.

Gillard, Randall Boyd, Tim Jameson, and Jeff Childers. (*Id.*) Boyd was disciplined for

improper checking of freight on December 21, 2000. (Doc. 62, Ex. 14.)

Plaintiff was written up on July 10, 1998 for not wearing a seatbelt on a forklift

and for not setting the brake on the forklift. (Doc. 64, Ex. 1 at 135-36, 190; Ex. 2 ¶¶ 10-

11.) Plaintiff says that after receiving the warning, he informed management that the

parking brake did not work, but nothing was done to repair it. (Doc. 64, Ex. 1 at 193.)

Also, plaintiff was not the only employee not wearing a seatbelt at the time, but he was

the only one to receive a warning. (*Id.*)

On March 3, 1997, plaintiff had an accident where he hit a parked car on the

company lot with a trailer. (Doc. 64, Ex. 1 at 138-39; Doc. 62, Ex. 10.) The next day, he

received a warning letter for having the accident, although he believes the accident was

not his fault because the car was improperly parked in the wrong place. (Doc. 64, Ex. 1 at

138-42; Ex. 2 ¶ 7; Doc. 62, Ex. 10.) Plaintiff believes white drivers had accidents similar

to his and did not receive discipline.  (Doc. 64, Ex. 2 ¶ 8; Ex. 1 at 149; Ex. 12 ¶ 6.)

Plaintiff alleges Jeff Smith, Larry Jones and Randall Boyd had accidents and did not

receive discipline, and Roadway does not dispute this.  (Doc. 64, Ex. 2 ¶ 8.)  Tim

Jamison, a white male, received a warning for an accident he had in June 1999.  (Doc. 62

¶ 12 and Ex. 11.)

**B.      Racially Hostile Work Environment Claim**

Plaintiff alleges Shanks called him "boy" on one occasion.  (Doc. 64, Ex. 1 at 117-

20.)  Plaintiff states this was the only occasion Shanks used a racial term or racially

offensive language that he actually heard.  (*Id.* at 119-20.)  During this conversation,

Shanks tried to force plaintiff to look at Shanks when Shanks was talking to him, but

plaintiff intentionally looked the other way.  (*Id.* at 120-21.)  Plaintiff also recalled

hearing Massey and Gordon telling a racial joke in front of him, but he does not

remember the specifics of the joke.  (*Id.* at 126.)  In addition, plaintiff asserts numerous

racially derogatory comments that he attributes to Shanks or Massey.  They will each be

analyzed below.

In June of 1999, plaintiff and two other black employees, Jefferson and Scruggs,

became aware of two dolls hanging by a rope on the defendant's bulletin board.  (Doc. 22

¶ 21; Doc. 64, Ex. 1 at 272; Ex. 13 at 95; Ex. 15 at 262-64.)  Plaintiff contends he saw

one doll, like a "black man hanging," that "could have been a brown doll," and it had

dreadlocks, which made the doll offensive to him.[4]  (Doc. 64, Ex. 1 at 272-76.)  In his

affidavit, Shanks only referred to one doll on the board, which he later took down, and he

included a photograph.[5]  (Doc. 62 ¶ 18 and Ex. 20.)  When asked "Were you offended by

[the doll]?", plaintiff replied, "Sort of, yes, sir," but he later said he and the other black

employees took offense to the dolls.  (Doc. 64, Ex. 1 at 275, 277.)  Scruggs, another black

employee, complained about the dolls several times before Shanks removed them.  (Doc.

64, Ex. 13 at 107-11.)  When Scruggs initially complained about the dolls, Shanks

allegedly told Scruggs the dolls were "dammit dolls," for people to use to take out their

frustrations.  (*Id.* at 108-09.)

Beginning in November 1999, plaintiff and other African-American employees

sent six letters to Roadway headquarters to complain of race discrimination and

_____

[4]The testimony regarding the doll, or dolls, is inconsistent on many points.  Plaintiff
recalled seeing one doll, that may have been brown, but it had dreadlocks and was an African-
American doll.  (Doc. 64, Ex. 1 at 272-74.)  He also stated it had a sign nearby with "something
about something bad day."  (*Id.* at 274.)  Plaintiff believes the doll was on the board for "four
months or more."  (*Id.*)  He was offended by the doll, and he believes the rope had a noose.  (*Id.*
at 275.)  However, if the doll were white, he testified he would not have been offended by its
display.  (*Id.* at 273-74.)  In his brief, plaintiff refers to two dolls, and he cites testimony from
Scruggs and Jefferson, in addition to his own testimony.  (Pl.'s Opp'n Br. at 11.)  Scruggs
testified he saw two dolls; one larger white textured doll with dreadlocks hanging by a rope
around its neck, and one brown textured doll with no discernable hair and no rope.  (Doc. 64, Ex.
13 at 92-108.)  Jefferson saw two dolls made of black cotton material, with dreadlocks, hanging
by a string around their necks.  (Doc. 64, Ex. 15 at 262-70.)

[5]This black and white photograph copy is not extremely clear.  (Doc. 62, Ex. 20.)  It
depicts one pale colored doll with short, possibly curly hair, attached to the board by no visible
means.  (*Id.*)  There are several papers posted near the doll.  (*Id.*)  There is no evidence that
plaintiff was shown the photograph or that he agreed that the photograph depicted the display he
saw.  The court will presume plaintiff's description of the doll is accurate for purposes of
summary judgment.

harassment. (Doc. 64, Ex. 1 at 158, 160-61, Exs. 17-22, Ex. 23 at 25.)  The district manager, Dave Huneryager, who supervises all managers in the district, was responsible for following through with an investigation of the letters. (Doc. 64, Ex. 23 at 26.)  He initially spoke only with Shanks about the letters, but he later visited the Huntsville terminal to investigate. (*Id.* at 34, 43, 54-55.)  Huneryager met with plaintiff and plaintiff told him he believed there was race discrimination at the Huntsville terminal. (Doc. 64, Ex. 1 at 283, 285-87; Doc. 62, Ex. 7.)  Plaintiff told Huneryager that he did not write any of the letters. (Doc. 64, Ex. 1 at 287.)  After visiting the Huntsville terminal, Huneryager concluded there was not enough evidence to suggest that race discrimination or other unlawful discrimination had taken place. (Doc. 64, Ex. 23 at 147-48.)  However, after Huneryager completed his investigation, defendant replaced some of the older equipment with newer equipment, requested a safety audit, and expanded the work area in the office. (*Id.* at 139-40.)  In July 2000, Roadway received another anonymous letter alleging discrimination, causing Roadway to hire a private investigator. (*Id.* at 176, Ex. 22.)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on October 3, 2000, alleging that Roadway had engaged in a pattern and/or practice of discrimination and harassment on the basis of his race. (Doc. 64, Ex. 3.)  Thereafter, he filed amended charges in November 2000 and March 2001. (Doc. 64, Ex. 4; Ex. 5.)  The EEOC issued plaintiff a notice of right to sue letter on May 29, 2002. (Doc. 64, Ex. 6.)  A "Determination" was issued by the EEOC on September 23, 2002,

stating the EEOC believed there was reasonable cause to believe that Roadway discriminated against plaintiff in several areas.  (Doc. 64, Ex. 7.)

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.    Discussion

### A.    Time Limitations

Title VII requires charges to be filed "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e). For § 1981 claims, the four year statute of limitations provided by 28 U.S.C. § 1658(a) applies. *See Edith Jones v. R.R. Donnelley & Sons. Co.,* U.S.___, 1245 S. Ct. 1836 (2004). Since plaintiff filed his EEOC charge on October 3, 2000, his Title VII claims based upon employment claims prior to April 6, 2000 are time barred. Also, plaintiff filed his complaint in this case on September 20, 2001, which means § 1981 claims that arose prior to September 20, 1997 are time barred.

Plaintiff contends the incidents alleged show a continuing violation on the part of defendant. However, evidence of a continuing violation may only be considered for purposes of plaintiff's racially hostile work environment claim. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)(given "that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim"); *E.E.O.C. v. Union Camp Corp.*, 7 F. Supp. 2d 1362, 1372 (S.D. Ga. 1997)(continuing violation doctrine is "applicable to hostile work environment claims because such claims are supported by [p]laintiff establishing an ongoing pattern of offensive conduct"). Evidence of discrete acts outside the applicable statute of limitations may not be considered for purposes of plaintiff's disparate treatment claim. *See National R.R. Passenger Corp.,* 536

U.S. at 113 (finding "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges").

### B.    Disparate Treatment Claims

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). In the absence of direct evidence of intent, plaintiff must establish discriminatory intent through circumstantial evidence. When a plaintiff chooses to establish disparate treatment by circumstantial evidence, the court employs the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of disparate treatment. *See Burdine*, 450 U.S. at 252-53.  If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employment action. *See McDonnell Douglas*, 411 U.S. at 802.  If defendant succeeds in carrying this burden, then plaintiff must prove that defendant's articulated reasons are a mere pretext for unlawful discrimination. *See Burdine*, 450 U.S. at 253.  At all times, plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact

regarding whether each of the defendant employer's articulated reasons are unworthy of credence, the employer is entitled to judgment as a matter of law on the plaintiff's claim. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

### 1.    Prima Facie Case

To establish a prima facie case of race discrimination based on disparate treatment, plaintiff must prove: (1) he belongs to a protected class; (2) he was subjected to an adverse job action; (3) similarly situated employees outside the protected class were treated more favorably; and (4) he was qualified for his job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Merriweather v. Ala. Dep't of Pub. Safety*, 17 F. Supp. 2d 1260, 1267 (M.D. Ala. 1998), *aff'd*, 199 F.3d 443 (table) (11th Cir. 1999). Also, the adverse action must be "causally related to [plaintiff's] status as a member of the protected class." *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1152 (N.D. Ga. 1997). Plaintiff alleges he was subject to disparate treatment in regard to his job assignments, his access to equipment, and the discipline he received.

Defendant argues plaintiff does not establish a prima facie case because he did not suffer an adverse job action, and because he cannot show similarly situated employees were treated more favorably.

### a.    Adverse Job Action

A change in employment is adverse only if it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Geer v. Marco Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1341 (M.D. Ala. 2001)(citation omitted). "[A]n employment action

must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it." *Merriweather*, 17 F. Supp. 2d at 1274. To constitute an adverse personnel action, plaintiff must have been subject to a tangible employment action – a serious and material change in the terms, conditions, or privileges of his employment. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Changing an employee's work schedule and increasing his workload does not necessarily constitute adverse action. *Geer*, 179 F. Supp. 2d at 1341 (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587-88 (11th Cir. 2000)(undesirable assignments are not adverse action)). Although the Eleventh Circuit has not addressed this issue, several courts have said that assignment of inferior equipment is not an adverse employment action. *See Geer*, 179 F. Supp. 2d at 1341 (improperly functioning cleaning equipment); *Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002)(inferior equipment); *Markel v. Bd. of Regents*, 276 F.3d 906, 911 (7th Cir. 2002)(plaintiff denied better equipment). Also, discipline that does not "trigger" some other tangible job consequence is not an actionable adverse employment action. *Davis*, 245 F.3d at 1241 (citing *Merriweather*, 17 F. Supp. 2d at 1275).

Plaintiff contends the bids, which are used to assign drivers times to begin their runs, were manipulated by defendant so that plaintiff would be assigned routes that were

-13-

more labor intensive due to their high amount of hand freight.  Under the union's CBA,

seniority for the driver is determined by their full-time start date with defendant, and each

driver, based upon his seniority, then chooses, or "bids," on a start time to begin work.  In

July 2002, plaintiff was ninth out of fourteen in seniority, meaning eight drivers chose

their start times prior to plaintiff.  Also, under the CBA, defendant has the right to assign

different areas, or change routes, for the various start times.

Plaintiff has not presented sufficient evidence to show that defendant changed the

routes associated with various start times in an effort to racially discriminate against him.

The one time plaintiff complained to defendant about bids, in July 1998, a representative

from his union investigated and the situation was remedied.  In addition, plaintiff's claim

for labor intensive job assignments does not amount to an adverse action under the law.

Plaintiff alleges defendant denied him access to newer and better equipment.  This

claim also fails; access to better equipment under the facts of this case, is not an

actionable adverse action.  When plaintiff's tractor broke down in August or September

of 2000, he was not given the best equipment available.  He was given Jeff Smith's

tractor, while Smith used a nicer road tractor.  Being required to drive older, less-

desirable equipment is not an actionable adverse action because it is not a serious and

material change in plaintiff's employment status.

Plaintiff also alleges the disciplinary warnings he received constitute adverse job

actions.  This claim also fails.  The record contains no evidence that the disciplinary

actions had any significant effect on plaintiff's employment status.  Because plaintiff's

-14-

disparate treatment claims based on discriminatory discipline do not rise to the level of actionable adverse actions, defendant's Motion for Summary Judgment as to plaintiff's disparate treatment claims will be granted.

**b.    Similarly Situated**

Assuming plaintiff suffered adverse actions, he has not offered evidence to show that similarly situated employees outside his protected class were treated more favorably. A comparator must be "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562; *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The burden is on the plaintiff to show a similarly situated employee outside his protected class. *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *modified*, 151 F.3d 1321 (11th Cir. 1998). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield*, 115 F.3d at 1562.

Plaintiff argues that he is similarly situated to several white employees. However, seniority is a decisive factor at Roadway for determining which employees receive which bids, and therefore, the routes for which they are responsible. Other than plaintiff's own testimony, he does not provide sufficient evidentiary proof to show he is similarly situated to his alleged comparators.

Plaintiff's alleged similarly situated employee with respect to his job assignments and access to equipment is Jeff Smith. Plaintiff has not provided enough evidence to

show he is similarly situated to Smith.  Plaintiff asserts that his route now has more stops and large amounts of hand freight, compared to when Smith bid on the route.  Plaintiff did not present sufficient evidence of how difficult the routes were for his alleged comparator.  There is neither sufficient evidence establishing that the number of stops for Smith were more or less frequent than plaintiff's, nor that Smith's runs had significantly more or less hand freight.

Plaintiff also alleges Smith drove a newer vehicle when plaintiff's equipment was not working.  Plaintiff does not establish his seniority level compared to Smith's to show they are similarly situated employees.  If Smith has more seniority, then he may be entitled to drive a newer tractor under the CBA.  Regardless, plaintiff has only offered one instance where another employee was given better access, or allowed to use, newer equipment.  This one instance does not support a conclusion that similarly situated employees outside plaintiff's protected class were treated more favorably.

In terms of discipline, the evidence shows that white drivers were disciplined for the same or similar work offenses as plaintiff.  Tim Jamison was disciplined for an accident in 1999, and Randall Boyd received a warning for improper checking of freight.  (Doc. 62 ¶ 12 and Exs. 11, 14.)  Although plaintiff alleges other instances where white employees were not disciplined, there is not sufficient proof to establish that these employees were similarly situated to the plaintiff.

## 2.   Legitimate, Non-discriminatory Reasons

Assuming a prima facie case, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for its actions.  Good faith actions by employers in regard to employees that are justified by neutral factors constitute legitimate, nondiscriminatory reasons. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Napier v. Weyerhauser, Inc.*, 766 F. Supp. 1574, 1583-84 (M.D. Ga. 1991).  When an employer offers legitimate reasons for its decisions, the relevant inquiry is whether the employer took the action in good faith and was not racially motivated, not whether the reasons are actually correct or wise. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000)(citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). The perception of the decision maker, not the employee, controls. *See Webb v. R&B Holding Co.*, 992 F. Supp. 1382, 1387 (S.D. Fla. 1998).  Reliance on a CBA in the application of its actions is a legitimate, nondiscriminatory reason for an employer. *See Barge v. Anheuser-Busch*, 87 F.3d 256, 259 (8th Cir. 1996)(granting summary judgment for employer, where company presented evidence that it followed CBA policy in assigning shifts according to seniority and ability).  "It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated." *Alexander*, 207 F.3d at 1341.

Once a defendant has offered evidence of legitimate, non-discriminatory reasons for its actions, a plaintiff can avoid summary judgment only by offering sufficient

evidence for a reasonable jury to disbelieve each of the proffered reasons and conclude that they were not what actually motivated the employer. *See Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1316-17 (11th Cir. 1998); *Combs v. Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997).

The CBA controls seniority at Roadway. Also, the CBA, and not Roadway, controls the bids and start times for employees. Although some runs are associated with particular start times, Roadway has the right to change the runs and start times based upon business needs. (Doc. 62 ¶ 10.) These business decisions to start different runs at different times are based on customer needs and other factors. (*Id.* ¶ 6.) In addition, plaintiff received disciplinary warnings when he actually committed work infractions.

Plaintiff has not offered sufficient evidence to prove that he suffered an adverse employment action, or that other similarly situated employees outside his protected class were treated more favorably. Also, Roadway has articulated legitimate, nondiscriminatory reasons for its employment decisions. For all these reasons, Roadway's motion for summary judgment is due to be granted on plaintiff's racially disparate treatment claims.

### C. Hostile Environment Claim

For an employee to prevail on a racially hostile work environment claim, plaintiff must present sufficient evidence to show: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's race; (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of

employment and create an abusive working environment; and (5) the employer is responsible for the environment under a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Plaintiff must show "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). Conduct that is merely offensive, unprofessional or boorish, even if it contains racial references, is not actionable. *See Harris*, 510 U.S. at 21; *see also Gullatte v. Westpoint Stevens, Inc.*, 100 F. Supp. 2d 1315, 1322 (M.D. Ala. 2000)(calling plaintiff "nigger" on three occasions over eight years was not sufficiently severe or pervasive to create a hostile environment); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1139 (N.D. Ga. 1997)(finding that calling plaintiff "black boy" and stating that writing on him with a black marker "would not show" did not rise to level of harassment); *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, 1573, 1577 (M.D. Ga. 1995)(granting summary judgment where plaintiff was subjected to racist graffiti such as "nigger ape" and "niggers go home to Africa" because conduct, though offensive, was not sufficiently severe or pervasive).[6]

---

[6]The court notes and agrees with the following:

  It is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001)(ellipsis in original) (quotation marks omitted);

Title VII is not "a general civility code." *Faragher v. City of Boca Raton*, 524

U.S. 775, 788 (1998).  Motions for summary judgment are appropriate to "police the

baseline for hostile environment claims." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244

(11th Cir. 1999)(en banc)(citation omitted).  When harassment is alleged, "courts must

consider the alleged conduct in context and cumulatively." *Id.* at 1242.

The severe or pervasive requirement has both an objective and a subjective

component.  *Miller*, 277 F.3d at 1276; citing *Harris*, 510 U.S. at 21-22.  "Thus, to be

actionable, [harassing] behavior must result in both an environment 'that a reasonable

person would find hostile or abusive,' and an environment that the victim 'subjectively

perceive[s] . . . to be abusive.'"  *Id.*   The objective severity of harassing conduct must be

determined by looking at the totality of the circumstances, including such factors as the

"frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

---

see also *Daso v. The Grafton School, Inc.*, 181 F. Supp. 2d 485, 493 (D. Md.
2002)("The word 'nigger' is more than [a] 'mere offensive utterance'. . . .  No
word in the English language is as odious or loaded with as terrible a history.");
*NLRB v. Foundry Div. of Alcon Indus., Inc.*, 260 F.3d 631, 635 n.5 (6th Cir.
2001)("That the word 'nigger' is a slur is not debatable.").  "Perhaps no single act
can more quickly alter the conditions of employment and create an abusive
working environment than the use of an unambiguously racial epithet such as
'nigger' by a supervisor in the presence of his subordinates." *Rodgers v.
Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)(citations and
internal quotation marks omitted).

*McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).  Of course, whether the
use of the "n" word is sufficient to establish a racially hostile environment actionable under Title
VII depends on the facts of the particular case.

[plaintiff's] work performance." *Harris*, 510 U.S. at 23; *Miller*, 277 F.3d at 1276; *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995). The standard is "demanding," and the conduct alleged must be "extreme" to alter a term, condition, or privilege of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Harassing conduct is severe or pervasive if it results in (1) an environment that a reasonable person would find hostile or abusive, and (2) the victim subjectively perceives that environment to be abusive. *Harris*, 510 U.S. at 21-22.

In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, plaintiff listed a number of incidents that he contends support his claim for a racially hostile work environment. The allegations are listed and examined below. Plaintiff's allegations as stated in his brief and his cites to the record are italicized.

1.  *Brazelton Depo.- Doc. 64, Ex. 10 at 117-120. Brazelton "wasn't doing nothing but nigger-rigging" [the truck].*
    Statement was made by D.H. Oden, "one of the white guys." Brazelton did not hear the comment. Ruben Cross told Brazelton about the statement. Oden apologized to Cross the next day, and Cross told Brazelton about the apology. There is no evidence that Brazelton or Cross relayed the statement to plaintiff, or that plaintiff was present at the time the statement was made.

2.  *Jefferson Depo.- Doc. 64, Ex. 15 at 156-61.* Statement is actually in doc. 64, ex. 15 at 135. *Shanks stated that "blacks [were] like black cobra snakes."*
    Rozea told Jefferson that Shanks made this statement. There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement. Jefferson alleges this and other statements occurred over "six months" during "the first year [he] was there." (Doc. 64, Ex. 15 at 135.)

    *Rozea Aff.- Doc. 64, Ex. 12 ¶ 15.*

-21-

Rozea says Shanks and Massey used the term "horrible snakes," and other racially derogatory statements to refer to black employees on numerous occasions. There is no evidence from this record cite that plaintiff was present at any of the times the statement was made, or that such statements were ever made to plaintiff.

3.   *Jefferson Depo.- Doc. 64, Ex. 15 at 135.  Shanks stated that blacks were "just worthless niggers that he had to hire because of the contract."*
Rozea told Jefferson that Shanks made this statement.  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.  Jefferson alleges this and other statements occurred over "six months" during "the first year [he] was there."  (Doc. 64, Ex. 15 at 135.)

*Kennedy Depo.- Doc. 64, Ex. 1 at 122-23.*
Rozea told plaintiff about a time when he heard Shanks tell Massey, "you can't trust these niggers, they like snakes."  There is no evidence from this record cite that plaintiff was present at the time the statement was made, or that the statement was ever directly made to plaintiff.  There is also no evidence when the statement was actually made.

4.   *Jefferson Depo.- Doc. 64, Ex. 15 at 136.  Shanks stated that "you have to look over the blacks because all the blacks is stupid."*
Rozea told Jefferson that Shanks made this statement.  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff has ever been told about the statement while employed at Roadway.  Jefferson alleges this and other statements occurred over "six months" during "the first year [he] was there." (Doc. 64, Ex. 15 at 135.)

5.   *Jefferson Depo.- Doc. 64, Ex. 15 at 136.  Shanks used the word "nigger."*
Statement was made to Jefferson.  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.

*Rozea Depo.- Doc. 64, Ex. 9 at 315.*
Statement was made to Rozea.  There is no evidence Rozea relayed the statement to plaintiff.  Rozea "only heard [Shanks] use the "N" word twice, on two things . . . ." (Doc. 64, Ex. 9 at 314.)  This term was used on one occasion around Christmas

-22-

1999.  (*Id.* at 317.)  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was ever told about the statement.

6.    *Jefferson Depo.- Doc. 64, Ex. 15 at 138.  Massey stated that "you don't need to be friends with that stupid big black nigger[] [plaintiff] because he's worthless."*
Rozea told Jefferson that Massey made this statement to Rozea about plaintiff.  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.

*Rozea Depo.- Doc. 64, Ex. 9 at 203.*
Rozea says Shanks and Massey said "[plaintiff] was a worthless nigger" on two occasions. There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.

7.    *Jefferson Depo.- Doc. 64, Ex. 15 at 140-41.  Massey stated that "we need to get rid of that nigger right there."*
Rozea told Jefferson that Massey said to Rozea, "you need to go on and get rid of that nigger Billy (plaintiff) . . . [a]nd Stanley [Shanks] just kind of laughed."  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.

8.    *Kennedy Depo.- Doc. 64, Ex. 1 at 126.  A racial joke.*
Plaintiff states he recalls Massey and Jeff Gordon telling a racial joke, but "I can't recall what [Massey] said, but he told me one of them.  I just let it blow over."  At page 127, Plaintiff states Gordon was in the office during the "joke meeting."

9.    *Jefferson Depo.- Doc. 64, Ex. 15 at 141.  Massey stated that "He (Massey) had a few worthless niggers that he wanted to . . . wanted somebody to go after them . . . they're nothing but drug addicts and dope smokers."*
Rozea told Jefferson that Massey made this statement to Rozea before Rozea was hired as a dispatcher.  There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.

10.   *Brazelton Depo.- Doc. 64, Ex. 10 at 302-03. "Boy."*
      Brazelton says the term is used by white employees, and is only used when talking
      to black drivers.  He does not recall black employees using the term.

      *Kennedy Depo.- Doc. 64, Ex. 1 at 118.*
      Plaintiff states Shanks called him "boy" on one occasion while they were on the
      loading dock.  Plaintiff says, at 119-20, that this is the only occasion Shanks used a
      racial term or racial language in front of plaintiff that he heard.

      *Rozea Aff.- Doc. 64, Ex. 12 ¶ 15.*
      Rozea says he has heard Shanks use this term on numerous occasions to refer to
      black employees.


11.   *Kennedy Depo.- Doc. 64, Ex. 1 at 123.  Massey stated that Kennedy "was piece of
      shit and a drug addict and a nigger and a drunk."*
      Plaintiff states Massey made this statement to Rozea, and Rozea relayed it to
      plaintiff.  Plaintiff says Massey made this statement "about the end of [1999] or
      somewhere in there."  There is no evidence from this record cite that plaintiff was
      present at the time the statement was made, or that the statement was ever made to
      plaintiff. (** or how and when plaintiff learned the statement was made.


12.   *Brazelton Depo.- Doc. 64, Ex. 10 at 114-16.  Massey stated that "we have two
      good niggers and two bad."*
      Brazelton did not hear this comment personally.  Nathan Rozea told Brazelton that
      Massey made the comment.  There is no evidence from this record cite that
      plaintiff was present at the time the statement was made, that the statement was
      ever made to plaintiff, or that plaintiff has ever been told about the statement while
      employed at Roadway.


13.   *Rozea Depo.- Doc. 64, Ex. 9 at 239.  Shanks stated that "black drivers don't
      deserve to be treated like white drivers."*
      Rozea at 239-40 says Shanks actually told him "you treat the white drivers
      different from the black drivers."  There is no evidence from this record cite that
      plaintiff was present at the time the statement was made, that the statement was
      ever made to plaintiff, or that plaintiff has ever been told about the statement while
      employed at Roadway.

-24-

14.    *Rozea Depo.- Doc. 64, Ex. 9 at 455. Shanks stated that "black employees are like acid, they are evil, and out to get us."*
Rozea says Shanks told him that plaintiff and James Endsley were "like hydrochloric acid, they would burn through the deepest of metals . . . [and] they were evil and they were snakes and had to watch them and get them." There is no evidence from this record cite that plaintiff was present at the time the statement was made, that the statement was ever made to plaintiff, or that plaintiff was told about the statement.

15.    *Brazelton Depo.- Doc. 64, Ex. 10 at 116. Massey named his dog "nigger."*
Rozea told Brazelton what Massey said he named his dog. Brazelton stated he does not know whether Massey even has a dog, or its name.

       *Kennedy Depo.- Doc. 64, Ex. 1 at 122.*
Rozea told Kennedy that Massey had a dog named "nigger." Kennedy has never heard Massey make this statement. There is no evidence from this record cite that plaintiff was present at the time the statement was made, or that the statement was ever made to plaintiff.

       *Jefferson Depo.- Doc. 64, Ex. 15 at 39. Statement is actually at 139.*
Rozea told Jefferson that Massey said Massey "had a dog named Nigger and one named Spook."

16.    *Rozea Aff.- Doc. 64, Ex. 12 ¶ 15. Shanks and Massey used the terms "worthless niggers" and "horrible snakes."*
Rozea says Shanks and Massey used these terms on numerous occasions to refer to black employees. There is no evidence from this record cite that plaintiff was present at the time any such statements were made, that the statements were ever made to plaintiff, or that plaintiff has ever been told about the statements while employed at Roadway.

       The statements attributed to Shanks and Massey are strong circumstantial evidence of a discriminatory bias against African-Americans. However, in determining whether a hostile environment exists, the court must look at the racially derogatory statements actually made in his presence, or statements that he was aware of during the time frame at

-25-

issue. Of the examples cited by plaintiff in his Memorandum in Opposition to Defendant's Motion for Summary Judgment, there are only five instances where the evidence reveals plaintiff heard, or was actually told of racially derogatory comments.[7] There were two arguably racial remarks specifically made to plaintiff: (1) number ten, being called "boy" by Shanks; and (2) number eight, a racial joke that plaintiff could not recall.

There were also three statements relayed to plaintiff by Rozea. These include: (1) number three, where Rosea told plaintiff that Shanks made a racially derogatory remark about the African-American employees at Roadway; (2) number eleven, where Rozea told plaintiff that Massey said plaintiff "was a piece of shit and a drug addict and a nigger and a drunk;" and (3) number fifteen, where Rosea told plaintiff that Massey had a dog named "nigger."

It goes without saying that the comments Rosea attributes to Shanks and Massey, if true, are reprehensible. Thus, in determining whether plaintiff was subjected to a hostile work environment, the court will consider, in addition to the "boy" comment and

---

[7]Other than those statements the court sets out below, the court will not consider the statements alleged by plaintiff in his opposition brief, and set out above, because there is no indication that plaintiff was aware of or heard about these comments while working at Roadway prior to filing his suit. Incidents unknown to plaintiff cannot contribute to his subjective view of a hostile environment. *Edwards*, 49 F.3d at 1522; *see Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)(fact that most comments were not directed at plaintiff contributed to court's conclusion that conduct was merely offensive and not severe enough to create a objectively sexually hostile environment).

the joke, the statements relayed to plaintiff by Rosea (numbers three, eleven and fifteen above), as well as plaintiff's testimony that he considered the "dammit dolls" offensive.

Incidents unknown to the plaintiff at the time they occur cannot contribute to his subjective view of a racially hostile environment. *Edwards*, 49 F.3d at 1522 (holding incidents made known to the plaintiff after her termination could not have contributed to her subjective view of a hostile environment). Other than the five comments mentioned above, there is no evidence that plaintiff knew of the other racial comments attributed to Shanks and Massey before he filed this lawsuit. Here as in *Edwards*, "there was insufficient information as to when the statements were made, how knowledge of them was acquired, and when [plaintiff] was informed of them." *Edwards*, 49 F.3d at 1522. While harassment directed at employees other than plaintiff should be considered, such second-hand harassment is entitled to less weight. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995); *Hudson v. Norfolk So. Railway Co.*, 209 F. Supp. 2d 1301, 1314 n.16 (N.D. Ga. 2001)(it is "well-established that slurs and insults heard second-hand do not carry the same weight as those made directly to the plaintiff")(citations omitted); *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, 1577 (M.D. Ga. 1995)(holding that fact that plaintiff learned of remarks second-hand diminished their severity).

The court finds plaintiff's hostile environment claim fails because the harassment was not sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment. Plaintiff presented six instances of conduct

that were racially derogatory in nature: (1) the dolls on the bulletin board, (2) Shanks

calling him "boy," (3) a racial joke, (4) Rozea telling plaintiff that Massey named his dog

"nigger," (5) Rozea telling plaintiff that Massey called plaintiff "a piece of shit, a drug

addict, a nigger, and a drunk," (6) Rozea telling plaintiff Shanks and Massey called black

employees "horrible snakes" and other racially derogatory terms.

The court has considered these six instances collectively, and finds that these

incidents of harassing conduct are not so severe or pervasive as to alter the terms,

conditions, or privileges of plaintiff's employment.  From plaintiff's perspective, the

incidents of harassing conduct were sporadic and not significantly humiliating or

threatening, especially  when considered in light of other decisions regarding claims of

racial harassment.  *See, e.g., Miller,* 277 F.3d at 1273-74 (plaintiff established a hostile

work environment based on evidence that, over a period of a couple of months, his co-

workers "used derogatory names in an intimidating manner, shouting them at [plaintiff]

during the course of berating him for his job performance," the comments continued after

co-workers told to stop); *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th

Cir. 1990) (remarks made by supervisor were "flagrant, revolting, and inflammatory, and

reflect[ed] . . . the deplorable atmosphere of open, hostile, and racially motivated

discrimination;" remarks were found to be "so 'commonplace, overt and denigrating that

they created an atmosphere charged with racial hostility.'").  In short, the handful of

incidents of which plaintiff was aware are not sufficiently "extreme to amount to a change

in the terms and conditions of [his] employment." *Faragher,* 524 U.S. at 788.

The court finds that plaintiff has not presented substantial evidence to show that the alleged harassing conduct was sufficiently severe or pervasive to create a hostile or abusive work environment. Therefore, defendant's Motion for Summary Judgment as to plaintiff's hostile work environment claim will be granted.

## IV.     Conclusion

For the reasons stated herein, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted. An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this the $\underline{29^{th}}$ day of September, 2004.

SHARON LOVELACE BLACKBURN
United States District Judge

-29-